1
2
3
4
5
6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7
8

KIM SNELL,

            Plaintiff,

CASE NO. 3:20-cv-06028-JHC

9

     v.

ORDER ON DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT

10
11
12
13

THE STATE OF WASHINGTON;
DEPARTMENT OF SOCIAL AND
HEALTH SERVICES, JUDITH A.
FITZGERALD and UNA I. WILEY,

         Defendants.

14
15

## I

### INTRODUCTION

16
17
18
19
20

    This matter comes before the Court on Defendants' Motion for Summary Judgment.

Dkt. # 32.  The Court has considered the submissions in support of, and in opposition to, the

motion, the applicable law, and the case file.  Being fully advised, the Court GRANTS the

motion in part and DENIES it in part.

21
22
23
24

II

**BACKGROUND**

Plaintiff Kim Snell brings five claims against Defendants State of Washington, its agency Department of Social and Health Services (DSHS), Judy A. Fitzgerald, and Una I. Wiley[1] based on alleged mistreatment and retaliation she suffered during her employment at the DSHS Office of Financial Recovery (OFR) from 2014 to 2021.  *See generally* Dkt. # 1.

Plaintiff joined the OFR in 2014 as a Revenue Agent 1.  Dkt. # 41 at 1.  She was promoted to Revenue Agent 2 in 2016 and then to Revenue Agent 4 in 2017.  *Id.* at 1–2.  She reported to Estate Recovery System Program Manager Shawn Hoage.  Dkts. ## 1 at 3; 34 at 2.

A.  Investigations of Shawn Hoage

In December 2018, Plaintiff complained to OFR management about anti-LGBTQ comments that Hoage made while on a personal phone call at the office, as well as Hoage's physically and orally threatening actions toward another employee (Lisa Ellis) for opposing these comments.  Dkt. # 41 at 4–5.  In January 2019, Hoage was placed on an alternative assignment pending an investigation into her conduct.  *Id.* at 5.

In January 2019, Una Wiley became OFR Office Chief.  Dkts. ## 34 at 1, 41 at 5.

In March 2019 Plaintiff provided a statement to the investigator assigned to Hoage's case.  Dkts. ## 41 at 6; 41–1 at 41–42.  Her statement included information about Hoage's anti-LGBTQ comments and aggressive conduct toward Ellis.  *Id.*  The investigator completed an Investigation Report and included a summary of his interview with Plaintiff but did not include information about Hoage's anti-LGBTQ comments.  Dkt. # 41–1 at 50–55.  Hoage received a

---

[1] Plaintiff's Complaint includes claims for Negligent Hiring and Negligent Retention of Ms. Wiley, but her response to Defendants' motion states that she is no longer pursuing these claims. Dkts. ## 1 at 15; 38 at 24.

Written Reprimand for failing to adhere to DSHS Administrative Policy 18.64, Standards of Ethical Conduct for Employees. *Id.* at 57–60.

In June 2019, Plaintiff was informed that Hoage would be reinstated to her position. Dkt. # 41 at 7. Plaintiff told Anmarie Aylward, Director of OFR, that she objected to Hoage's reinstatement and that Hoage's actions violated DSHS's anti-discrimination, anti-retaliation, and hostile workplace policies. *Id.*

On June 12, 2019, a petition entitled "End Harassment at OFR" was circulated. Dkt. # 41–1 at 62–66. It called for rescission of DSHS's decision to reinstate Hoage. *Id.* Plaintiff signed the petition, along with about 30 other employees. *Id.* The petition was delivered to Cheryl Strange, DSHS Secretary. *Id.* The petition led to another investigation of Hoage. Dkt. # 41–1 at 72–118. The investigation ended in October 2019, and the investigator concluded that the allegations lacked specificity. *Id.* at 115. Hoage returned to her position, but because of a reorganization of the unit she reported to Plaintiff. Dkt. # 41 at 9.

In December 2019, Plaintiff met with Hoage to outline her job duties. *Id.* Plaintiff claims that during the meeting, Hoage indicated to Plaintiff that she knew what Plaintiff had said in her investigative interview. *Id.* at 10. The day after the meeting, Plaintiff reported Hoage's comment to Wiley. *Id*; Dkt. # 41–1 at 120–21.

B.  Amber Wright's promotion to MA4

In June 2018, Amber Wright joined the OFR as an Office Assistant 3. Dkts. ## 41 at 11; 35 at 1–2. Shortly after Wiley was hired as OFR Office Chief in January 2019, Wright requested a Developmental Job Assignment (DJA) to assist Wiley with administrative work. Dkt. # 35 at 2. A DJA is a voluntary assignment, designed to teach new skills, that an OFR employee can apply for on top of their own regular work. *Id.* Wiley approved Wright's DJA request in March 2019. *Id*; Dkt. # 34 at 2–3.

ORDER ON DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT - 3

In the spring of 2019, Wiley created a proposed job description for a full-time administrative assistant.  Dkts. ## 34 at 3; 35 at 2; 41 at 12.  It is disputed whether Wiley created the position description on her own or whether Wright assisted.  *Id.*  The Class and Classification Unit (CCU) approved the proposal.  *Id.*  The position was listed as a Management Analyst 4 (MA4) position.  *Id.*

Wright applied for the position and was selected.  Dkts. ## 34 at 3; 35 at 2; 41 at 13–14.  Plaintiff alleges that Wright was significantly less qualified than at least one other applicant.  Dkt. # 41 at 13.  She also alleges that Wiley showed favoritism to Wright by providing her with the interview questions before her interview and by raising the salary range of the position so that Wright's salary would more than double.  *Id.* at 13–14.

Plaintiff claims that her signature was forged on the position description form for the MA4 position and as a result Wright's pay increased exponentially.  Dkt. # 41 at 17.

C.  Plaintiff's promotion to Collection Manager

In August 2019, a reorganization placed OFR under the oversight of Facilities and Finance Administration (FFA), which was managed by Assistant Secretary Judith Fitzgerald.  Dkts. ## 33 at 1; 41 at 15.

In August 2019, Plaintiff applied for a Collection Manager position.  Dkts. ## 34 at 4–5, 41 at 15.  Plaintiff was interviewed and selected for the position.  *Id.*  Plaintiff claims that Wiley offered to share the interview questions before her interview, and she declined.  Dkt. # 41 at 15.  Wiley claims that she never made such an offer.  Dkt. # 34 at 5.

D.  Collections conference in New York

In November 2019, Plaintiff and Wiley attended a conference in New York City.  Dkt. # 41 at 20.  Plaintiff believed the conference was an unnecessary expense and brought this concern to HR, but ultimately attended the conference.  *Id.* at 19–20.

ORDER ON DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT - 4

1   Plaintiff claims that Wiley wanted to attend the conference because some of her family

2   members would coincidentally be in New York City at the same time, and she wanted to make

3   the trip "a family vacation." Dkt. # 41 at 20. She claims Wiley missed several sessions to spend

4   time with her family. *Id.*

5   E.  Una Wiley's treatment of Chris Boyd

6   Beginning in March 2019, Plaintiff began to notice Wiley mistreating another supervisor

7   named Chris Boyd. Dkt. # 41 at 21. Plaintiff claims that Wiley spoke with her about "getting rid

8   of" Boyd by citing his FMLA condition as a reason he could not perform his job. *Id.*

9   In May 2019, Boyd was removed from his appointment as Financial Recovery Supervisor

10  and re-classified as a Revenue Agent 3 (a lower-level position). Dkt. # 41 at 21. Soon after he

11  was placed on alternate assignment. Dkt. # 41–2 at 24–28. Boyd returned to the office in July

12  2019 after being given an oral reprimand. Dkts. ## 41 at 23; 41–2 at 38. In October 2018, Boyd

13  requested an investigation into ethics violations, discrimination, intimidation, and inappropriate

14  behavior. Dkt. # 41–2 at 37–39. In December 2019, Boyd was reallocated to Financial

15  Recovery Enforcement Officer 3 (a lower-level position than Revenue Agent 3). Dkt. # 41 at 25.

16  F.  Plaintiff's complaints and alleged retaliation

17  As discussed above, Plaintiff reported Hoage's anti-LGBTQ statements and threatening

18  behavior to OFR management in December 2018. Dkt. # 41 at 5. In March 2019 she provided a

19  witness statement to the investigator assigned to Hoage's case. *Id.* at 6; Dkt. # 41–1 at 41–42. In

20  June 2019, Plaintiff signed a petition objecting to Hoage's reinstatement. Dkt. # 41–1 at 62–66.

21  In December 2019, after Hoage had returned to her position (but at this point reporting to

22  Plaintiff, per a re-organization), Plaintiff met with Wiley to report that Hoage had brought up her

23  investigation during a work meeting and it had made her feel uncomfortable. Dkt. # 41 at 10.

24

ORDER ON DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT - 5

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Sometime around September 2019, Plaintiff consulted the agency's Employee Assistance Program (EAP) to discuss her concerns, including about Wiley's instruction that she "get rid of people by way of reasonable accommodation." *Id.* at 16.  EAP instructed Plaintiff to report her concerns to HR.  *Id.*  On October 7, 2019, Plaintiff met with Tiffany Womack from HR and reported (1) the alleged forgery on the MA4 position description form, (2) Wiley's practice of offering certain internal candidates interview questions before interviews, (3) Wiley's plan to "make a family vacation" out of the New York conference, (4) Wiley's mistreatment of Boyd, and (5) Plaintiff's fear of retaliation.  Dkts. ## 41 at 16; 41–2 at 2.  Plaintiff made this report while Wiley was on vacation because she feared retaliation.  Dkt. # 41 at 25.

Plaintiff claims that after she met with HR on October 7, 2019, Wiley began a "mission" against her to revert her to her former position.  Dkt. # 41 at 25.  Plaintiff states the Wiley began to compile unfounded complaints against Plaintiff in a "communication log."  *See* Dkt. # 34–2. There is a dispute over the timing of these complaints; Wiley claims that she received "multiple complaints" about Plaintiff by late September.  Dkt. # 34 at 5.  Plaintiff claims that 20 complaints were made after she reported to HR on October 7, 2019, and two were made just a week before her report.  Dkt. # 41 at 26–28.

Plaintiff emailed Fitzgerald on October 28, 2019, to schedule a meeting to address her concerns.  Dkt. # 41–2 at 54–55.  Fitzgerald forwarded the email to Wiley and Womack and stated that "it might not be a good idea" for her to meet with Plaintiff.  *Id.* at 54.  Womack replied and stated that she supported Fitzgerald meeting with Plaintiff, but Wiley expressed that she would rather Plaintiff address her concerns directly with her.  *Id.*  About 30 minutes after Wiley received Fitzgerald's forwarded email, Wiley emailed HR to request that Plaintiff's trial service be terminated and that she be reverted to her Revenue Agent 4 position.  *Id.* at 60.

One day later, on October 29, 2019, Wiley reported Plaintiff for an alleged ethics violation (accepting a vacation from one of her subordinates).  Dkt. # 41–2 at 62.  Plaintiff denies this allegation; she claims the comment about vacationing together was a joke.  Dkt. # 41 at 32.

On November 12, 2019, Plaintiff met with Fitzgerald.  Dkts. ## 41 at 32; 41–2 at 66.  Plaintiff claims that she expressed her concerns about the forged signature, the misuse of government money, that Wiley was not following DSHS policies in interviewing and hiring, and Wiley's attacks on other employees.  Dkt. # 41 at 32–33.  Fitzgerald recalls the meeting differently, stating that Plaintiff simply talked about how much she enjoyed the conference and getting to know Wiley.  Dkt. # 33 at 3.

On January 29, 2020, Wiley emailed Fitzgerald informing Fitzgerald that Plaintiff had been sharing interview questions and giving preferential treatment to certain internal applicants.  Dkt. # 41–2 at 82–83.  She expressed concerns about Plaintiff's "ability to make sound management decisions" and emphasized that she had been requesting that Plaintiff be reverted to her former position since October 2019.  *Id.*  Fitzgerald granted Wiley permission to revert Plaintiff to her former position.  *Id.* at 85.

On January 30, 2020, Plaintiff received a reversion letter, effective February 1, 2020.  *Id.* at 90.  Her annual salary was reduced by $22,000.00.  Dkt. # 41 at 41.

On February 4, 2020, Plaintiff emailed Womack in HR and expressed her belief that her reversion was an act of retaliation for her prior reports to HR about Wiley's inappropriate behavior.  Dkt. # 41–2 at 95–96.  Womack responded acknowledging receipt of the email and advised Plaintiff to contact the Employee Assistance Program (EAP).  *Id.* at 98.  The record does not contain any evidence that Plaintiff's February 4, 2020 email was responded to, other than by Womack to confirm receipt and to advise contacting the EAP.  *Id.* at 104.

Plaintiff alleges that throughout March and April 2020, Wiley continued to fabricated accusations against her, such as that she created a toxic work environment, mistreated other employees, and violated DSHS policies.  Dkt. # 41 at 44–45.

G.  Tort claim

Plaintiff filed a tort claim on June 26, 2020.  Dkt. # 41 at 45.  DSHS contacted Wiley in July 2020 to request emails relevant to Plaintiff's tort claim.  Dkt. # 41–2 at 112.

At some point after Plaintiff filed her tort claim, OFR management placed her on alternative assignment.  Dkt. # 41 at 45.

In late July, DSHS received two complaints about Plaintiff, one alleging that she was abusing her supervisory authority (by violating hiring protocols, borrowing money from employees, and living with employees), and the other alleging that she was using or soliciting drugs at work.  Dkts. ## 41 at 46; 41–2 at 120–21.  HR conducted an investigation in July and August 2020.  Dkt. # 41–3 at 2–6.  The Washington State Patrol (WSP) conducted a separate investigation in October and November 2020.  *Id.* at 8–103.  While Plaintiff was under investigation, OFR management removed her from the organization chart and phone list, resulting in confusion among staff and humiliation for Plaintiff.  Dkt. # 41 at 48.

In September 2020, Wiley suspended Plaintiff from supervisory duties because of the investigation.  Dkts. ## 41 at 53, 41–3 at 105.

On April 9, 2021, Plaintiff received a Notice of Intent to Discipline for these offenses: (1) borrowing money from staff, (2) living with staff, (3) sharing interview questions with a candidate who was selected to fill a position, (4) fostering a contentious work environment with workplace gossip and an open disdain for management as a member of the leadership team, and (5) sharing confidential DSHS documentation with my attorney in a tort claim, including HIPAA information.  Dkt. # 41–3 at 109–16.

On July 23, 2021, Plaintiff was demoted from a Revenue Agent 4 to a Support Enforcement Office 2, effective August 2, 2021. Dkt. # 41–3 at 266–275. The basis for this discipline was borrowing money from a subordinate employee and sharing confidential DSHS documentation that included HIPAA-protected information. *Id.* at 266. Plaintiff claims that other staff members committed similar or more severe violations over the course of her employment but were not similarly disciplined, making her believe her demotion was an act of retaliation. Dkt. # 41 at 55–56.

H. Procedural history

Plaintiff filed her complaint here on October 19, 2020. Dkt. # 1. On March 1, 2023, Defendants filed a Motion for Summary Judgment seeking dismissal of all claims. Dkt. # 32.

### III

### DISCUSSION

A. Summary Judgment

Summary judgment is appropriate if the evidence shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cnty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007). A fact is "material" if it may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "'genuine' only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party." *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001) (citing *Anderson*, 477 U.S. at 248-49).

The moving party bears the initial burden of showing there is no genuine dispute of material fact and that it is entitled to prevail as a matter of law. *Celotex*, 477 U.S. at 323. If the moving party does not bear the ultimate burden of persuasion at trial, it can show the absence of such a dispute in two ways: (1) by producing evidence negating an essential element of the

nonmoving party's case, or (2) by showing that the nonmoving party lacks evidence of an essential element of its claim or defense. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000). If the moving party meets its initial burden, the burden then shifts to the nonmoving party to identify specific facts from which a fact finder could reasonably find in the nonmoving party's favor. *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 252.

The Court is "required to view the facts and draw reasonable inferences in the light most favorable to the [nonmoving] party." *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh evidence or make credibility determinations because those are "jury functions, not those of a judge." *Anderson*, 477 U.S. at 249-50. But the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott*, 550 U.S. at 380 (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

B. Plaintiff's § 1983 claims[2]

To state a claim for relief under 42 U.S.C. § 1983, a plaintiff must show that: (1) they suffered a violation of rights protected by the Constitution or created by federal statute, and (2) the violation was proximately caused by a person acting under color of state law. *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). Plaintiff claims that Defendants violated her First Amendment rights to free speech and to petition the government. *See* Dkt. # 1 at 15.

---

[2] Defendants argue that Plaintiff should be precluded from bringing claims against Wiley or Fitzgerald in their individual capacities because she asserted this theory of liability for the first time in her response brief. Dkt. # 42 at 3–4. The Court finds that Plaintiff's clarification of her claims does not constitute a "novel theory," *see Coleman v. Quaker Oats Co.,* 232 F.3d 1271, 1292–03 (9th Cir. 2000), and that Defendants do not suffer prejudice if Plaintiff is permitted to proceed on this theory since Defendants have fully briefed the issue, *see Smith v. City & Cnty. Of Honolulu,* 887 F.3d 944, 951–52 (9th Cir. 2018). And as the Court explains below, Plaintiff's claims fail on either theory.

a.   Plaintiff's free speech claim

A government employer "may impose certain restraints on the speech of its employees, restraints that would be unconstitutional if applied to the general public."  *City of San Diego, Cal. v. Roe*, 543 U.S. 77, 80 (2004).  But the state "may not abuse its position as employer to stifle 'the First Amendment rights [its employees] would otherwise enjoy as citizens to comment on matters of public interest.'"  *Eng v. Vooley,* 552 F.3d 1062, 1070 (9th Cir. 2009) (quoting *Pickering v. Bd. of Ed. Of Tp. High Sch. Dist. 205, Will Cnty., Illinois,* 391 U.S. 563, 568 (1968)).

To reconcile a government employee's right to engage in speech and a government employer's right to protect its own legitimate interests in performing its mission, the *Pickering* court adopted a balancing test.  The test requires courts to balance "the interest of the [employee] as a citizen, in commenting on matters of public concern, and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering,* 391 U.S. at 568; *see also Connick v. Myers,* 461 U.S. 138, 142 (1983).  But not all statements by a public employee are entitled to balancing; the Supreme Court in *Connick* and later in *City of San Diego* clarified a threshold inquiry (implicit in *Pickering* itself) that in order to merit balancing, a public employee's speech must touch on a matter of "public concern."  *City of San Diego,* 543 U.S. at 82–83 (citing *Connick,* 461 U.S. at 143).  The Court concludes that Plaintiff has not satisfied this threshold inquiry.

Plaintiff bears the burden of showing that her speech addressed an issue of public concern.  *See generally Connick,* 461 U.S. 138; *Bauer v. Sampson,* 261 F.3d 775, 784 (9th Cir. 2001).  "Speech involves a matter of public concern when it can fairly be considered to relate to 'any matter of political, social, or other concern to the community.'"  *Johnson v. Multnomah Cnty., Or.,* 48 F.3d 420, 422 (9th Cir.1995) (quoting *Connick,* 461 U.S. at 146); *see also*

*Coszalter v. City of Salem,* 320 F.3d 968, 973 (9th Cir. 2003) ("speech that deals with 'individual personnel disputes and grievances' and that would be of 'no relevance to the public's evaluation of the performance of governmental agencies' is generally not of 'public concern.'" (quoting *McKinley v. City of Eloy,* 705 F.2d 1110, 1114 (9th Cir. 1983)). "'Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record.'" *Johnson,* 48 F.3d at 422 (quoting *Connick,* 461 U.S. at 147–48).

"First and foremost, we consider the content of the speech." *Weeks v. Bayer*, 246 F.3d 1231, 1234 (9th Cir. 2001). Plaintiff made internal complaints about what she perceived to be unfair hiring practices by her coworkers and superiors, inefficient government spending, unfair treatment of various employees by their managers, and violations of agency policies and procedures. *See generally* Dkt. # 41. Although she tries to frame her complaints as necessarily implicating the competency and efficiency of DSHS, the Court finds that they are mainly related to "internal power struggles within the workplace," and are of little relevance "beyond the employee's bureaucratic niche." *Tucker v. Cal. Dep't of Educ.*, 97 F.3d 1204, 1210 (9th Cir. 1996). Plaintiff's complaints about her supervisors' treatment of other employees (including Hoage and Wiley's treatment of Ellis, Boyd, and Wright), as well as her claims that DSHS failed to adequately investigate their behavior, are analogous to the complaints made in *Desrochers v. City of San Bernardino,* 572 F.3d 703, 711 (9th Cir. 2009). There, two San Bernardino police sergeants filed grievances against their supervisors, alleging that they had "created a hostile work environment," violated various SBPD internal policies, and repeatedly harassed employees. *Id.* at 708. The sergeants also accused SBPD leadership of failing to take appropriate action upon receiving the grievances. *Id.* The Ninth Circuit concluded that the grievances primarily concerned a personality dispute centered on management style, and that there were no allegations

of conduct amounting to "actual wrongdoing or breach of public trust" such that the proper functioning of the police department was jeopardized. *Id.* at 712 (citing *Connick*, 461 U.S. at 148). Similarly, Plaintiff's complaints document the alleged "hostile work environment" created by Hoage and Wiley, her perception that they violated internal policies, and her disagreement with their hiring and personnel decisions. But without more, these complaints do not rise to the level of "broader societal concern," nor do they implicate the proper functioning of DSHS as a whole; they are instead more properly characterized as "essentially a private grievance." *See Roe v. City & Cnty. of San Francisco*, 109 F.3d 578, 585 (9th Cir. 1997); *see also Connick*, 461 U.S. at 141 (questioning internal office transfer policies, office leadership's lack of response to grievances, and other employees' lack of confidence in supervisors was not protected speech). Similarly, Plaintiff's complaints about Wright's promotion and substantial pay increase, as well as the decision to send employees to the New York collections conference, constitute a disagreement with DSHS leadership's spending priorities but fall short of allegations of "misuse of public resources." *See, e.g.*, *Johnson,* 48 F.3d at 425; *Roth v. Veteran's Admin.,* 856 F.2d 1401, 1405 (9th Cir.1988) (not all speech concerning government inefficiency deserves protection). With respect to the form and context of the speech, Plaintiff's complaints were not directed to the public or media, but internally within DSHS. *See Johnson,* 48 F.3d at 425; *Roe*, 109 F.3d at 585 (a limited audience weighs against a claim of protected speech). And although Plaintiff says little about her intent in making complaints, she does not claim that it was to "provoke a robust debate of a public issue," or to otherwise expose DSHS's internal practices to the public. *See generally* Dkt. # 41; *Roe*, 109 F.3d at 585. The Court thus concludes that Plaintiff's speech did not address an issue of public concern, and therefore is not protected under the First Amendment.

Even if the Court assumes that Plaintiff's speech did address a matter of public concern, and that the *Pickering* test would weigh in her favor, it concludes that qualified immunity protects Defendants Wiley and Fitzgerald from liability.  Public officers are shielded from liability for civil damages if their conduct does not violate clearly established rights of which a reasonable person would have known.  *See, e.g.*, *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Malley v. Briggs,* 475 U.S. 335, 341 (1986); *Knox v. Southwest Airlines,* 124 F.3d 1103, 1107 (9th Cir. 1997).  And the Ninth Circuit has held that, because the determination of whether a public employee's speech is constitutionally protected "turns on a context-intensive, case-by-case balancing analysis, the law regarding such claims will rarely, if ever, be sufficiently 'clearly established' to preclude qualified immunity under *Harlow* and its progeny."  *Moran v. State of Wash.*, 147 F.3d 839, 847 (1998).  Plaintiff has not pointed to any caselaw directly holding that her speech was protected, nor does she present extraordinary facts that would render the results of the multi-factor *Pickering* test any easier to divine than the average case.  Thus, she has not shown that her right to speak was so "clearly established" that Defendants would have known that their actions violated her First Amendment rights.  The Court therefore grants Defendants' motion as to Plaintiff's free speech claim.

    b.   Plaintiff's right to petition claim

The rights of speech and petition share substantial common ground and are often considered "cognate rights."  *See, e.g.*, *Thomas v. Collins*, 323 U.S. 516, 530 (1945).  "[T]he right of access to courts for redress of wrongs is an aspect of the First Amendment right to petition the government."  *Sure-Tan, Inc. v. NLRB,* 467 U.S. 883, 896–897 (1984).  Plaintiff claims that Defendants retaliated against her "for the filing of the tort claim and her prior whistleblowing actions."  Dkt. # 1 at 14.

In *Borough of Duryea, Pa v.* Guarnieri, 564 U.S. 379 (2011), the Supreme Court addressed whether the First Amendment's "public concern test" applies to the Petition Clause.  It answered in the affirmative, explaining that "[a]doption of a different rule for Petition Clause claims would provide a ready means for public employees to circumvent the test's protections." *Id.* at 393.  The Court emphasized that the government can and often does adopt statutory and regulatory mechanisms to protect the rights of employees against improper retaliation or discipline, while preserving important government interests, and that the petition clause is "not an instrument for public employees to circumvent these legislative enactments when pursuing claims based on ordinary workplace grievances." *Id.* at 392.  For the reasons articulated above, the Court finds that Plaintiff's complaints and tort claims do not raise issues of public concern.[3] Further, even if the First Amendment did protect Plaintiff against retaliation for the filing of her tort claims, Defendants Wiley and Fitzgerald would be entitled to qualified immunity since Plaintiff has provided no caselaw "clearly establishing" that her lawsuits involved issues of public concern. *See Harlow,* 457 U.S. at 818.  The Court therefore grants Defendants' motion as to Plaintiff's right to petition claim.

Lastly, to the extent that Plaintiff asserts § 1983 claims against DSHS or the State of Washington, the Court dismisses these claims because "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989).

C.  Jurisdiction over state-law claims

Defendants argue that if the Court dismisses both of Plaintiff's § 1983 claims, it should decline to exercise supplemental jurisdiction over the remaining state-law claims.  Dkt. # 32 at

---

[3] Nothing in the record suggests that Plaintiff raised new or different issues in her tort claim than through her internal complaints.

16.  A federal court has supplemental jurisdiction over pendent state claims to the extent they are so related to claims in the action within the court's original jurisdiction that they form a part of the same case or controversy.  28 U.S.C. §1367(a).  When a court rules against plaintiff and dismisses federal claims before trial, that does not automatically divest the court of supplemental jurisdiction; the dismissal is a factor for the court to consider in deciding whether to exercise its supplemental jurisdiction.  *See United Mine Workers v. Gibbs*, 383 US 715, 728 (1966); *Brady v. Brown,* 51 F3d 810, 816 (9th Cir. 1995).  Indeed, it may be an abuse of discretion to dismiss the remaining state-law claims when factors of judicial economy, convenience, and fairness to the parties strongly point toward retaining jurisdiction and no novel or complicated issue of state law is involved.  *See Trustees of Const. Industry & Laborers Health & Welfare Trust v. Desert Valley Landscape & Maint., Inc.,* 333 F.3d 923, 926 (9th Cir. 2003) (ordering dismissal of state-law claims just 7 days before trial and after long delays was neither fair to parties nor efficient use of judicial resources, and thus abuse of discretion).  The Court concludes that, as the parties have been litigating this case in federal court since 2020 and trial is less than two months away, dismissing Plaintiff's state-law claims would be unfair to Plaintiff and an inefficient use of judicial resources.  It therefore retains jurisdiction over Plaintiff's state-law claims despite the dismissal of her § 1983 claims.

D.  Plaintiff's WLAD Retaliation claim

To establish a prima facie case of retaliation under RCW 49.60.210(1), an employee must show that: (1) the employee took a statutorily protected action, (2) the employee suffered an adverse employment action, and (3) a causal link between the employee's protected activity and the adverse employment action.  *Cornwell v. Microsoft Corp.*, 192 Wash. 2d 403, 411–12, 430 P.3d 229 (2018); *see also Currier v. Northland Services, Inc.,* 182 Wash. App. 733, 742–43, 332

P.3d 1006 (2014).  If the plaintiff establishes a prima facie case, the defendant may rebut the claim by presenting evidence of a legitimate nondiscriminatory reason for the adverse action.  *Id.*  This shifts the burden back to the plaintiff to prove that the employer's reason is pretextual.  *Id.*

The parties address entirely different claims in their briefing.  Defendants' motion argues that Plaintiff has not established a prima facie case of WLAD *discrimination*.  *See* Dkt. # 32 at 17–21.  They cite RCW 49.60.180 (the WLAD discrimination provision) and *Domingo v. Boeing Emps.' Credit Union,* 124 Wash. App. 71, 81, 98 P.3d 1222 (2004), a case that articulates the elements of a prima facie case of WLAD discrimination.  *Id.* at 17.  Plaintiff's response clarifies that she is not pursuing a WLAD discrimination claim but a WLAD *retaliation* claim.[4]  *See* Dkt. # 38 at 15 (citing RCW 49.60.210(1) and various retaliation cases).[5]  Yet Defendants continue to reference WLAD discrimination in their reply brief.  *See* Dkt. # 42 at 7–9.  Defendants are the moving party, and thus they bear the initial burden of showing that there is no genuine dispute of material facts as to the elements of Plaintiff's claim.  *Celotex*, 477 U.S. at 323.  Because they fail to address the three elements of a prima facie WLAD retaliation claim, they have not carried their initial burden and the Court assumes that these elements are met.

But Defendants' motion does include a section titled "DSHS Had Non-Discriminatory Reasons for Ending Ms. Snell's Trial Services as Collections Manager," Dkt. # 32 at 19, and their reply contains a section entitled "Defendants Have Produced Legitimate, Nondiscriminatory Reasons for Taking Action Against Ms. Snell," Dkt. # 42 at 9.[6]  These

---

[4] As discussed above, a plaintiff may clarify their claim in a response to a motion for summary judgment if it does not raise a "novel issue" or prejudice defendant.  *Coleman,* 232 F.3d at 1292–03; *Smith,* 887 F.3d at 951–52.

[5] Plaintiff's response includes one confusing sentence stating that "Ms. Hoage and Ms. Wiley are comparators, as are other employees not demoted for intentional HIPAA violations," Dkt. # 38 at 16, but the rest of their brief focuses on WLAD retaliation.

[6] It is unclear why Defendants focus only on justifying Snell's reversion in their motion, when she alleges other adverse employment actions in her complaint.

arguments do apply to the second step of the burden shifting framework for Plaintiff's WLAD retaliation claim.  Courts evaluate the persuasiveness of an employer's stated legitimate nondiscriminatory[7] reasons for taking adverse employment actions once a prima facie case has been established.  *See Currier,* 182 Wash.App. at 742–43.  Therefore, even assuming—as the Court does here—that Plaintiff has established a prima facie case for WLAD retaliation, the Court must dismiss the claim if (1) Defendants present evidence of a legitimate nondiscriminatory reason for the adverse action(s), and (2) Plaintiff cannot prove pretext.

Defendants argue that Plaintiff was reverted from Collection Manager to her former RA4 position because she "could not implement two fundamental managerial practices, first, to support upper management decisions, and second, to collaborate with her management peers and not interfere with their work or the management of their staff."  Dkt. # 32 at 19.[8]  Defendants argue that Plaintiff was reverted because she borrowed money from employees she supervised, accepted gifts from staff, and asked to stay overnight at her staff's homes.  *Id.*  Defendants state that "Ms. Snell's continued personal relationships with those she supervised led, in part, to the end of Ms. Snell's trial service."  *Id.*  Defendants add in their reply that Plaintiff was reverted based on her refusal to complete tasks directed by Wiley, and because she violated hiring practices such as sharing interview questions with internal candidates.  Dkt. # 42 at 10.[9]

---

[7] Courts use the term "nondiscriminatory" broadly to encompass nonretaliatory motives.  *See, e.g., Currier,* 182 Wash. App. at 742–43.

[8] The Court finds it irrelevant that Plaintiff "signed a form acknowledging that the [Collection Manager] position had a one-year trial service period during which period management could end the trial service and revert her to her former Revenue Agent 4 classification."  Dkt. # 32 at 19.  This form does not enable Defendants to circumvent the WLAD and revert Plaintiff if their motives are retaliatory.

[9] Defendants argue that they should be entitled to the "same actor inference," which provides that "where the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory action."  Dkt. # 42 at 10 (citing *Crudder v. Peotia Unified Sch. Dist. No. 11,* 468 F.App'x 781 (9th Cir. 2012)).  But as the court in *Crudder* explains, this inference arises when a Plaintiff alleges *discrimination*, not retaliation.  Because Plaintiff does not allege discrimination, the same actor inference is inapplicable.

But Plaintiff provides sufficient evidence of pretext to survive a motion for summary judgment.  First, she contrasts the consistently positive feedback, promotions, and awards she received at OFR before her October 7, 2019, meeting with HR, see Dkt. # 41–1 at 2–29, with the reprimands, reversion, and demotion she received after the meeting, *see, e.g.*, Dkt. # 41 at 27. She also discusses the temporal proximity between her protected activities and the adverse employment actions she suffered; for example, that Wiley's email to HR requesting her reversion was sent about 30 minutes after Plaintiff requested to meet with Fitzgerald to discuss concerns with the unit.  Dkt. # 41–2 at 54–60.  She also argues that other OFR employees committed similar violations of internal policies (such as DSHS hiring practices) and laws (such as HIPAA) but did not face similar adverse employment actions.  *See, e.g.*, Dkt. # 41 at 3–11 (discussing violations by Hoage), 11–25 (discussing violations by Wiley).  This evidence, when viewed in the light most favorable to Plaintiff, raises genuine issues of fact as to whether Defendants' stated reasons are "merely a pretext for impermissible retaliation."  *Winarto v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276, 1284 (9th Cir. 2001).  The Court therefore denies Defendants' motion as to Plaintiff's WLAD retaliation claim.[10]

E.  Plaintiff's RCW 63.60 claim

RCW 63.60 provides that "[e]very individual or personality has the property right in the use of his or her name, voice signature, photograph, or likeness," which is "freely transferable, assignable, and licensable," and survives the "death of the individual or personality."  RCW 63.60.010.  A violation of the WPRA occurs when:

---

[10] Plaintiff argues that the Cat's Paw theory of liability should apply to her WLAD retaliation claim.  Dkt. # 38 at 20.  The Court concludes that it need not rely on this theory because it has already assumed that causation is established.  *See supra* p. 18 (because Defendants have not met their burden as to Plaintiff's prima facie case for WLAD discrimination, the Court assumes that all three elements for a prima facie case have been met).

ORDER ON DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT - 19

[Any person . . . uses or authorizes the use of a living or deceased individual's or personality's name, voice, signature, photograph, or likeness, on or in goods, merchandise, or products entered into commerce in this state, or for purposes of advertising products, merchandise, goods, or services, or for purposes of fund-raising or solicitation of donations, or if any person disseminates or publishes such advertisements in this state, without written or oral, express or implied consent of the owner of the right . . .

RCW 63.60.050.  Plaintiff alleges that Defendants violated her rights under the WPRA when they forged her signature on a position description form (PDF) that was later used to elevate Wright from a salary level 31 to level 51.  Dkt. # 38 at 24.[11]

The plain language of the statute does not cover the conduct at issue.  A PDF does not constitute "goods, merchandise or products entered into commerce in this state" under the ordinary meaning of those terms, nor was it used for the purposes of advertising products, merchandise, goods, or services, or for purposes of fund-raising or solicitation of donations.  RCW 63.60.050.  *See Food Mktg. Inst. V. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019) ("In statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself." (citing *Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 407 (2011)); *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999) (where that examination yields a clear answer, judges must stop).

The only support Plaintiff cites for her argument is an unpublished Washington Court of Appeals case in which the court found that a real estate appraisal fell under the statute's definition of a "product" because it is "something produced by physical labor or intellectual effort: the result of work or thought."  *See Immelt v. Bonneville,* 2014 WL 2960422, 182 Wash. App. 1005 (2014) (citing WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1810 (2002)).

---

[11] Defendants claim that the signature appeared on the document as a result of a collation error, but for the purposes of this order the Court will assume the signature was forged.  *See Scott*, 550 U.S. at 378 (the Court is "required to view the facts and draw reasonable inferences in the light most favorable to the [nonmoving] party.").

1

2

But the holding of *Immelt* is neither binding on this Court nor on point.  Although the creation of

the PDF arguably involved intellectual effort, it was not entered into commerce, nor was it used

3

to advertise products entered into commerce.  Nor does Plaintiff argue here that her signature

4

was used to certify the intellectual effort expended in the creation of the PDF, but to "creat[e] the

5

false appearance of oversight" of the job description and salary level.  Dkt. # 38 at 24.

6

Plaintiff cites no other authority to support her argument that a PDF falls under the

7

statute, instead arguing that "[t]here is no reason why the protection should not extend to a

8

forgery fraudulently used to boost the pay of a government employee."  Dkt. # 38 at 24.  The

9

Court concludes that the plain language of the statute prohibits this application and therefore

10

grants Defendants' motion as to Plaintiff's RCW 63.60 claim.

11

F.  Plaintiff's RCW 42.40 claim

12

RCW 42.40 protects the rights of state employees to "disclose . . . improper governmental

13

actions . . . [and] identify rules warranting review."  RCW 42.40.010.  Under the statute, a

14

"whistleblower" is defined as an employee who "in good faith reports [or provides information

15

regarding] alleged improper government action" to a public official designated to receive

16

whistleblower reports by the head of a government agency.  RCW 42.40.020(7); (10).  A

17

violation of RCW 42.40 occurs when an employee's right to report is improperly interfered with,

18

RCW 42.40.030, or when they face workplace reprisal or retaliatory action based on their

19

actions, RCW 42.40.050.  Plaintiff alleges that she was retaliated against after reporting good

20

faith concerns—specifically the waste of government funds, forgery of her name on a PDF, and

21

interference with the MA4 recruitment process—to Fitzgerald.  Dkt. # 38 at 25.

22

The parties agree that to establish a prima facie case of retaliation, an employee must

23

show that (1) they engaged in statutorily protected activity, (2) the employer took an adverse

24

employment action, and (3) the adverse action was caused by the employee's activity.  *See* Dkt.

ORDER ON DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT - 21

# 38 at 25 (citing *Milligan v. Thompson,* 110 Wash. App. 628, 638, 42 P.3d 418 (200); Dkt. # 42 at 11.  RCW 42.40.050(2) further provides:

> The agency presumed to have taken retaliatory action . . . may rebut that presumption by proving by a preponderance of the evidence that there have been a series of documented personnel problems or a single, egregious event, or that the agency action or actions were justified by reasons unrelated to the employee's status as a whistleblower and that improper motive was not a substantial factor.

Defendants argue that Plaintiff is not entitled to protection under RCW 42.40 because "Ms. Wiley was never the appointing authority and, therefore, had no authority to take employment actions against [Plaintiff]," and because Wiley was "not the decision-maker as to [Plaintiff's] trial service." Dkt. # 32 at 24.  They also argue it is logically impossible for upper management's decision to end Plaintiff's trial service to be motivated by her protected activities, since they were not the targets of her complaints.  *Id.*

Plaintiff points out in her response that in addition to her meeting with Wiley and HR, she also reported her concerns to Fitzgerald, the Assistant Secretary of DSHS.  Dkt. # 38 at 25; *see also* Dkts. ## 41 at 32; 41–2 at 66.  And many of the adverse employment actions she alleges in her briefing occurred after this meeting.  *See, e.g.*, Dkts. ## 41–2 at 90 (January 2020 reversion), 41 at 45 (summer 2020 placement on alternative assignment); 41–3 at 2–6 (July/August 2020 internal investigation); 41–3 at 8–103 (October/November 2020 WSP investigation); 41–3 at 109 (April 2021 Notice of Intent to Discipline); 41–3 at 266–75 (August 2021 demotion).  Defendants concede in their reply that Fitzgerald is a public official "authorized to receive [whistleblower] reports" under the statute, Dkt. # 42 at 11, but claim that she "does not recall [Plaintiff] giving her statements indicating these were whistleblower complaints or that alerted her of a need to forward such information to the State Auditor's Office or HR to investigate," *id.* at 11–12.

ORDER ON DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT - 22

On a motion for summary judgment, the Court is "required to view the facts and draw reasonable inferences in the light most favorable to the [nonmoving] party." *Scott*, 550 U.S. at 378. It therefore assumes Plaintiff's account of her November 12, 2019, meeting with Fitzgerald is true, and that she did in fact report alleged government improper government actions. The Court further notes that the whistleblower statute does not require an employee to specify that a report is a "whistleblower report," or instruct the designated authority to forward their report to the auditor or HR, to qualify for protection. *See generally* RCW 42.40. Nor does the Court find it relevant that the decision-makers who allegedly took adverse employments against Plaintiff were not the subject of her complaints. Indeed, Plaintiff has provided evidence of communication within DSHS and OFR leadership that could support an inference of causality between her reports and the subsequent adverse employment actions. *See, e.g.*, Dkt. # 41–2 at 54 (Fitzgerald's email to Wiley and HR informing them that Plaintiff wished to meet with her). And with respect to Defendants' proffered legitimate reasons for taking adverse actions against her, as discussed above, Plaintiff has provided sufficient evidence that improper motive was a substantial factor in these actions. *See supra* Section III.D. The Court therefore denies Defendants' motion as the Plaintiff's RCW 42.40 claim.

G. Plaintiff's motion to strike

Plaintiff argues that the Court should strike paragraphs 4, 5, 9, 15, 16, 17, 18, and 20 of Wiley's declaration, paragraphs 6, 8, and 9 of Fitzgerald's declaration, and paragraph 9 of Wright's declaration as hearsay. Dkt. # 38 at 26. Regarding Wiley's declaration, the Court did not consider paragraphs 4, 5, 9, 15, or 17 in reaching its conclusions and therefore denies the motion as moot, and without prejudice, as to these paragraphs. With respect to paragraphs 16, 18, and 20, which discuss complaints about Plaintiff's behavior that Wiley allegedly received from other OFR employees, these paragraphs are not being offered to prove the truth of the

complaints but to show that Wiley received them.  They are therefore not hearsay statements, and the Court denies Plaintiff's motion as to these paragraphs.  Regarding Fitzgerald's declaration, the Court did not consider paragraphs 6 or 9 in reaching its conclusions and therefore denies the motion as moot, and without prejudice, as to these paragraphs.  With respect to paragraph 8, this paragraph is not being offered to prove the truth of the statements made by Plaintiff during the November 12, 2019, meeting (i.e., Defendants do not offer these statements to prove that Plaintiff enjoyed the New York conference), but to support Defendants' argument that Plaintiff did not report alleged improper government action during the meeting.  It is therefore not a hearsay statement, and the Court denies Plaintiff's motion as to this paragraph. With respect to Wright's declaration, the Court did not consider this paragraph in reaching its conclusions and therefore denies the motion as moot and without prejudice.

Lastly, Defendant argues that Wiley's communication log should be stricken as containing hearsay and double hearsay statements.  Dkt. # 38 at 26.  The Court did not consider any notes from Wiley's communication log in reaching its conclusions and therefore denies the motion as moot and without prejudice.

## IV

### CONCLUSION

For these reasons, the Court GRANTS Defendants' motion with respect to Plaintiff's § 1983 claims and RCW 63.60 claim and DENIES Defendants' motion with respect to her WLAD retaliation claim and RCW 42.40 claim.

/

/

/

ORDER ON DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT - 24

Dated this 19th day of April, 2023.

John H. Chun
United States District Judge